KAPLER *v.* STATE

[No. 95, October Term, 1949.]

Decided March 8, 1950.

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON; and MARKELL, JJ.

*Michael Paul Smith* and *W. Albert Menchine* for the
appellant.

*Kenneth C. Proctor, Assistant Attorney General,* with
whom were *Hall Hammond, Attorney General,* and
*Francis T. Peach, State's Attorney for Baltimore County,*
on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

The appellant was convicted in the Circuit Court for
Baltimore County in a trial before a jury on each of
seven criminal informations charging bookmaking ac-
tivities. The charges were placed against appellant fol-
lowing a search conducted by the police under a search
warrant. Timely objection to the validity of the warrant
was made by a motion to quash, which was overruled,
and then by objection at the trial to the admissibility of
evidence seized under the warrant, which objection was
also overruled.

The search warrant in the case was issued by the Honorable J. Howard Murray, associate judge of the third judicial circuit, on the affidavit of Sergeant C. A. Eitemiller of the Baltimore County Police Department. The affidavit alleged upon information and belief, and the court found, that there was probable cause to believe that a misdemeanor was being committed, in that the law in relation to bookmaking was being violated, in a one-story concrete or cinder block building on the southernmost side of Eastern Avenue, directly to the rear of the premises known as 411 Eastern Avenue, in Baltimore County, and adjacent to an alley running parallel to Eastern Avenue at approximately 150 feet distant therefrom. The Sergeant recites certain things which were observed by Officer Story of the Department, and certain information which Story received from an unknown informant. These recitals are as follows:

"Upon receipt of a complaint that bookmaking is being conducted on the above described premises at the rear of 409 and 411 Eastern Avenue, Essex, Baltimore County, the affiant instructed Officer Edner Story, a member of the Baltimore County Police Department, to investigate the complaint and to watch the said premises in an effort to obtain evidence of bookmaking activities.

"On Friday, May 6, 1949, Officer Story observed the above described premises and noted that the building marked ' "G" ' on the aerial photograph attached hereto, marked ' "State's Exhibit A" ' and prayed to be taken as a part hereof, is constructed to resemble a two car private family garage, with the customary sliding garage door facing on the alley shown on said exhibit, and is approximately 25 feet wide and 50 feet long, has only one window, covered on the inside, preventing observation of the interior; and on the west wall of the building is a closed booth marked ' "L" ' on State's Exhibit ' "A" ' and partially hidden from view by the stairway marked ' "S" ' on said exhibit, said lookout booth being approximately 6 feet wide and 3 feet in depth with two small windows approximately one foot square, and to the rear of this booth is a solid oak door into the said described

building; that the entrance to the lookout booth is located about 10 feet from steps leading to the rear door of property number 409 Eastern Avenue, which is a tavern, duly licensed for the sale of alcoholic beverages, said tavern steps being marked ' "T" ' on the aforesaid exhibit.

"On Saturday, May 7, 1949, at about two o'clock P. M. and shortly thereafter, approximately twenty men walked out the rear door of the tavern located at 409 Eastern Avenue and entered said building to the rear of 411 Eastern Avenue. As these men approached the building an elderly man was sitting in the lookout booth referred to and looked at each man steadily before admitting them to the booth. These men left the said described building, gradually, in small groups around six o'clock P. M.

"On Thursday, May 12, 1949, Officer Story engaged in conversation with a man whose name is not known, who stated that on Saturday, May 7, 1949, he had been allowed to go through the door to the rear of the lookout booth into a large room where he observed two men behind a wooden counter engaged in taking bets from a group of men standing in the room. These two men are described as follows: The first is described as being approximately 32 years of age, medium height, black hair, brown eyes, dark complexion, clean shaven, slender and apparently of Italian extraction. The name of this man is reported to be Frank DiCarlo. The second man is described as being approximately 35 years of age, slender build, clean shaven, dark hair, long pointed nose and apparently of Hebrew extraction. This man is known by the name of John. In the large room, a radio was announcing the results and post times of horse races at various race tracks; on the wooden counter were copies of the ' "Daily Racing Form" ' and ' "Armstrong Scratch Sheet" ', both publications containing the names of horses entered in races and being widely used in bookmaking activities; pencils and small pieces of paper that were being used to record bets on horse races. Officer Story's informant stated that he saw the two men behind the counter take from many men slips of paper together

with varying sums of money, and immediately after, a race result was announced, the men behind the counter would give varying sums of money to the various individuals.

"On Saturday, May 14, 1949, at about two o'clock P. M. and shortly thereafter, approximately twenty-five men entered the building marked ' "G" ' in the aforesaid State's exhibit in the same manner as described on the preceding Saturday, May 7, 1949, and remained in the building until approximately six o'clock P. M., but it was not possible for Officer Story to observe what occurred inside the building.

"It is to be noted that on May 7, 1949 and on May 14, 1949, at the times referred to above, horse racing was being conducted on at least six different race tracks, including the Pimlico race track in Baltimore City, and that between the hours when the men referred to above entered and left the said building, is the period when most horse race betting and bookmaking activities are conducted."

This affidavit was sworn to by Sergeant Eitemiller, and thereupon the warrant was issued to search the building and to arrest two men, neither of whom are parties to this case.

At the trial, the motion to quash the warrant and to suppress and return the evidence, which was made by the appellant and others, attacked the warrant on various grounds which will be hereinafter discussed, but it does not allege the relationship of the parties to the property or the articles seized. But at the trial of the case and before the testimony about the search was admitted, it was stipulated that the property, in which the search was made, was owned by William Kapler and his wife. Kapler was not found on the property when the search was made, although telephone receipts found in the premises were in Mr. Kapler's name and in that of Mr. Walter Kesler, care of Mr. W. Kapler. Kapler testified that he had rented the property to Kesler until July 1, and that he left January 2nd for Florida, and came back when he was advised that there was a warrant out

for him. Under these circumstances the State contends that Kapler had no interest in the premises sufficient to justify him in making a motion to quash the evidence obtained as a result of the raid, or to object to its admission in evidence against him.

This Court has a number of times declined to permit a person who had no interest in the premises to object to the admission of evidence found in a raid there, even though such person was indicted as the result of such raid. In so doing, the court has negatively indicated who *could* object. Thus, in *Baum v. State,* 163 Md. 153, 157, 161 A. 244, 245, it was held that illegal search and seizure is a privilege personal to those whose rights thereunder have been infringed, and they alone may invoke it. The Court cited a number of authorities and stated as its conclusion "One cannot complain of an illegal search and seizure of premises or property which he neither owns, nor leases, nor controls, nor lawfully occupies, nor rightfully possesses, or in which he has no interest." In *Frankel v. State,* 178 Md. 553, 562, 16 A. 2d 93, 97, it was said "It seems to be established that immunity from illegal search and seizure is a privilege personal to those whose rights have been infringed, and they alone may invoke it." In *Leon v. State,* 180 Md. 279, 286, 23 A. 2d 706, the same statement is made. In *Bevans v. State,* 180 Md. 443, at page 448, 24 A. 2d 792, the court repeated the quotation from *Baum v. State,* above set out. In *Resnick v. State,* 183 Md. 15, 18, 36 A. 2d 347, the same statements are again repeated. The formula stated and repeated in these cases is that, in order to complain of an illegal search, a person must *own* or lease or control, or lawfully occupy or rightfully possess, or *have an interest in the premises* or property searched and taken. Kapler owned the property in question jointly with his wife. The English common law rule against searches and seizures was the outgrowth of the constant intrusion by royal agents into private premises for the purpose of finding among the papers and effects there kept evidence of political offenses. This English common law rule was

in force here at the time of the Revolution, and was incorporated in the Constitution of the United States and in that of many of the States. (See Maryland Declaration of Rights, Article 26). The prohibition is not confined to homes or dwellings. In *Sugarman v. State,* 173 Md. 52, 195 A. 324, it was held that search could not be made of an automobile, but subsequently, Section 306 of Article 27 of the Code was enacted authorizing search warrants for "any building, apartment, premises, place or thing". We have now interpreted this to cover automobiles and filling stations (*Asner v. State,* 193 Md. 68, 65 A. 2d 881; *Bratburd v. State,* 193 Md. 352, 66 A. 2d 792) and tourist camps (*Lucich et al, v. State,* 194 Md. 511, 71 A. 2d 432). A garage, like a filling station or a tourist cabin, or any other building, may contain evidence, not only against the lessee, but against the owner, and the latter, on trial, has such an interest that he may object to evidence produced by what he claims to be an unlawful search of his property.

The primary objection to the affidavit and warrant is that they include statements gotten by Officer Story from an unknown man who told him what went on in the building. It has been held in this state that the facts set out in the warrant do not have to be within the personal knowledge of the applicant, but it is sufficient if the responsible official sources from which the facts were derived are set forth in the warrant, as the basis of the belief of the affiant. *Allen v. State,* 178 Md. 269-275, 13 A. 2d 352. In *Goodman v. State,* 178 Md. 1, 11 A. 2d 635, it was held that all the cases agree that no warrant should be issued merely on information and belief, without stating the facts and source of information on which the belief is based. In *Foreman v. State,* 182 Md. 415, 35 A. 2d 171, the warrant was made by a police officer on the information of two other named officers, and that warrant was held to be good. In *Frankel v. State, supra,* the affidavit was made by a sergeant based on observation of two policemen, and it was held good. In *Smith v. State,* 191 Md. 329, 62 A. 2d 287, 5 A. L. R.

2d 386, the warrant was held good, but the court said that no such warrant should be issued if based merely on information and belief unless the facts and sources of information on which the belief is based are stated. We have, heretofore, had no case before us in which the affiant has attempted to show probable cause by reciting facts which he obtained, not only from an unnamed witness who has no official standing, but from an unknown witness. To permit this sort of recital to justify the granting of a warrant to search property would lead to such abuse that it cannot be tolerated. No person would be safe from intrusion upon his property if a police officer, by merely reciting that he had information from an unknown person that a misdemeanor was being committed there, could get a search warrant and go through the premises. The warrants must not only contain facts, but they must contain responsible sources for them. In no case has this Court, so far, upheld a warrant unless it was based upon information which was given to an officer by other officers whose names appeared in the affidavit. We think that those parts of the affidavit and warrant which contain a recital of the alleged conversations with the unknown individual form no basis for a proper search warrant.

That, however, does not conclude the matter, because in the case of *Bratburd v. State, supra,* an affidavit was made by a sergeant of the Montgomery County Police Department, that he believed a misdemeanor was being committed by the defendant in a Packard automobile. Some of the facts alleged were obtained by the sergeant himself from his own observation, and others were obtained from Officer Wiley who gave him an affidavit about something that he had seen. We held that the information from Officer Wiley was not more than suspicion, but that the information Sergeant Whelan himself obtained showed probable cause, and, therefore, we held the search was legal. The obvious inference from that decision is that even if the affidavit contains insufficient information or even improper information, which should

not be considered by the court, nevertheless, if in addition it contains sufficient proper information to show more than a possibility that a crime is being committed, the court is justified in issuing it. Upon this theory it becomes necessary for us to examine the affidavit before us to see whether the information, other than that which we have ruled out, was sufficient to justify the issuance of the warrant.

The facts show that the building to be searched was a garage in the rear of a sporting goods store, and in the rear and to the side of a tavern. This garage had only one window which was covered on the inside so that the interior could not be observed. On the side of the building towards the saloon was a closed booth, or as the appellant described it, a storm door, which was about six feet wide and three feet in depth, with two small windows each approximately one foot square. The entrance to this booth was about 10 feet from the steps leading to the rear door of the tavern. On successive Saturday afternoons in May, when horse racing was being conducted on at least six different tracks, including the Pimlico Race Track in Baltimore City, at about two o'clock P. M., a number of men, approximately 20 on the seventh, and 25 on the 14th, walked out of the rear door of the tavern and entered the building through the booth. There was an elderly man sitting in the booth, who looked at each man steadily before he admitted him. These men left the garage, generally in small groups, about six o'clock. It is contended that these facts do not constitute sufficient justification for allowing the searching of the premises, because there is nothing unlawful in 20 or 25 men congregating in a building and that they could have been there for some lawful purpose. It was suggested in the argument that they might have been there for the purpose of a political conference, or looking at television, or having some sort of an entertainment. To expect a judge or a court to believe that this number of men voluntarily and willingly went into a closed garage, without light or air from the outside, and stayed there for four successive hours on two

Saturday afternoons for purpose of innocent pleasure which could have been had under much more agreeable circumstances, is practically an insult to the intelligence of the judiciary. When you add to these facts the observation of the elderly man who looked out of the little windows at each man as he came, before he was admitted, the facts present much more than a possibility. Something furtive, and probably unlawful, was apparently going on in that garage, and, upon presentation of those facts, we think the judge was correct in issuing the search warrant.

The appellant urges upon us the case of *Wood v. State*, 185 Md. 280, 44 A. 2d 859, where a number of men and women would enter a restaurant, and only stay a few minutes at a time, on a number of successive days, and it was contended that this indicated probable cause that a numbers game was going on there. We held, however, that this particular restaurant may have sold tobacco, candy and other things, and although the case was a border line one, the facts by themselves were not suspicious. We noted that in other cases, where warrants had been upheld, there had been other suspicious circumstances than the mere number of people seen, especially "precautionary measures to prevent intrusion by unwanted guests." It would serve no good purpose to go over the facts in other cases in which unusual numbers of people have been seen going into buildings under peculiar circumstances. We think, in the case before us, the numbers were so unusual, the circumstances were so peculiar, and the arrangements made to keep out unwanted persons were so obvious, that there was shown more than a suspicion or possibility that gambling laws were being violated.

The state contends that even if the entire warrant were held invalid, nevertheless, as the officers entered through an open door, without hindrance, at the time of the raid, the evidence was admissible in any event. Since we hold that the warrant was properly issued, we do not have to pass upon this question.

*Judgment affirmed with costs.*