885 A.2d 785

Wesley WHITING a/k/a Jeffrey Wilson a/k/a Lynell Whiting

v.

STATE of Maryland.

No. 4, Sept. Term, 2005.

Court of Appeals of Maryland.

Nov. 8, 2005.

Michael R. Malloy, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

Petitioner Wesley Whiting, also known as Jeffrey Wilson and Lynell Whiting, seeks review of a judgment of the Court of Special Appeals affirming the Circuit Court's dismissal of Whiting's motion to suppress evidence as the fruit of alleged illegal searches of 810 East Preston Street, Baltimore, Maryland, a house owned by the City in which Whiting was a "squatter." On April 7, 2005, this Court granted Whiting's Petition for Writ of Certiorari to address the question that Whiting has presented to us for review:

Did the lower Court err by ruling that Petitioner did not have standing to challenge the legality of the search of the house where he was residing without a property interest?

*Whiting v. State*, 386 Md. 180, 872 A.2d 46 (2005). We hold that, although Whiting did possess a subjective expectation of privacy in the second floor rear bedroom of 810 East Preston Street, his expectation of privacy was not objectively reasonable, and as a result, he did not have standing under the Fourth Amendment to challenge the searches.[1]

---

1. The question presented in the Petition for Certiorari is phrased in the singular with respect to "search," although there were two searches that occurred, one on April 27, 2001 and one on May 4, 2001. The

## I. Background

On April 7, 2001, Baltimore City Police Officers responded to 1136 Homewood Avenue in Baltimore to try to find William Jerome Moore, Jr., a Correctional Officer who had failed to report to work for two days. Upon arriving at the home, the officers discovered Moore's body. An autopsy showed that Moore's death was caused by blunt force trauma.

During the investigation, detectives were able to identify Moore's cellular phone number, despite failing to recover the phone. The cellular phone records were subpoenaed from the phone company and reflected use after Moore's death. On April 26, 2001, after having traced calls made from the cellular phone, detectives located and spoke with a witness who had received a call from Whiting and believed that Whiting had called from a number resembling Moore's phone number. Another witness also made a photographic identification of Whiting as the individual in possession of Moore's cellular phone, and an acquaintance of Whiting reported that Whiting lived at 810 East Preston Street in Baltimore, where, in fact, he had been arrested on April 21, 2001, on unrelated charges. The investigation eventually culminated in the execution of two search warrants on April 27, and May 4, 2001 at 810 East Preston Street where police recovered various items of personal property, some of which contained blood.

On April 30, 2001, Whiting was served with an arrest warrant for the murder of Moore. He was later indicted for one count of first degree murder in violation of Maryland Code (1957, 1996 Repl.Vol.), Section 407 of Article 27,[2] one

---

transcript of the suppression hearing reflects consideration of standing with respect to both searches, although the Court of Special Appeals appears to have evaluated Whiting's standing only with regard to the May 4, 2001 search. The Petition for Writ of Certiorari refers to two searches. Our holding disposes of the standing question with respect to both the April 27, 2001 and May 4, 2001 searches.

2. Maryland Code (1957, 1996 Repl.Vol.), Section 407 of Article 27, states:

count of first degree assault in violation of Maryland Code (1957, 1996 Repl.Vol.), Section 12A–1 of Article 27,[3] one count of second degree assault in violation of Maryland Code (1957, 1996 Repl.Vol.), Section 12A of Article 27,[4] one count of robbery in violation of Maryland Code (1957, 1996 Repl.Vol.), Section 486 of Article 27,[5] and one count of theft in violation of

---

All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree.

Section 407 has been recodified without substantive change as Maryland Code (2002), Section 2–201 of the Criminal Law Article.

**3.** Maryland Code (1957, 1996 Rep. Vol., 2001 Supp.), Section 12A–1 of Article 27, states:

(a) *Serious physical injury; use of a firearm.*-(1) A person may not intentionally cause or attempt to cause serious physical injury to another.

(2) A person may not commit an assault with a firearm, including:

(i) A handgun, antique firearm, rifle, shotgun, short-barreled shotgun, or short-barreled rifle, as those terms are defined in § 36F of this article;

(ii) An assault pistol, as defined in § 36H–1 of this article;

(iii) A pistol, revolver, or antique pistol or revolver, as those terms are defined in § 441 of this article; and

(iv) A machine gun, as defined in § 372 of this article.

(b) *Penalty.*—A person who violates this section is guilty of the felony of assault in the first degree and on conviction is subject to imprisonment for not more than 25 years.

Section 12A—1 has been recodified without substantive change as Maryland Code (2002), Section 3–202 of the Criminal Law Article.

**4.** Maryland Code (1957, 1996 Repl.Vol.), Section 12A of Article 27, states:

(a) *General prohibition.*—A person may not commit an assault.

(b) *Violation; penalties.*—A person who violates this section is guilty of the misdemeanor of assault in the second degree and on conviction is subject to a fine of not more than $2,500 or imprisonment for not more than 10 years or both.

Section 12A has been recodified without substantive change as Maryland Code (2002), Section 3–203 of the Criminal Law Article.

**5.** Maryland Code (1957, 1996 Repl.Vol.), Section 486 of Article 27, states:

Every person convicted of the crime of robbery or attempt to rob, or as accessory thereto before the fact, is guilty of a felony, shall restore the thing robbed or taken to the owner, or shall pay to him the full value thereof, and be sentenced to imprisonment for not more than 15 years.

Maryland Code (1957, 1996 Repl.Vol.), Section 342 of Article 27.[6]

Whiting moved to suppress the evidence seized during the April 27 and May 4, 2001 searches of 810 East Preston Street. The State countered by contesting Whiting's standing to challenge the searches, alleging that Whiting was a "squatter" or trespasser in the house. At the suppression hearing, Whiting argued that he had standing to challenge the searches of 810 East Preston Street because he had a legitimate expectation of privacy in the second floor room where he was staying and, as evidence of such, introduced items seized during the April 27th search of 810 East Preston Street, including: one college registration in the name of Wesley Whiting, his address listed at 39 Liberty Road; four photographs; one letter addressed to Jeffrey Wilson at 300 East Madison Street from Crystal Whiting, and one letter addressed to Crystal Whiting at 609 29th Street from Wesley Whiting with his return address listed as Forrest Street. Whiting also introduced the affidavit in support of the application for the April 27th search warrant of 810 East Preston Street, which included the phrase that "a witness who reported knowing Wesley Whiting said when interviewed that Wesley Whiting had told him that he had

---

Section 486 has been recodified without substantive change as Maryland Code (2002), Sections 3–401 and 3–402 of the Criminal Law Article.

**6.** Maryland Code (1957, 1996 Repl.Vol.), Section 342 of Article 27, in relevant part, states:

(a) *Obtaining or exerting unauthorized control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and:

(i) Has the purpose of depriving the owner of the property; or

(ii) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(iii) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

Section 482 has been recodified without substantive change as Maryland Code (2002), Section 7–104 of the Criminal Law Article.

been living at the address determined to be the vacant house at 810 East Preston Street."

The State, conversely, argued that Whiting did not have standing to challenge the searches and introduced a copy of a deed reflecting that the Housing Authority of Baltimore City owned 810 East Preston Street, and a copy of the last lease for the premises, showing that Joyce Melvin, Robert Anderson, Corderio Washington, and Donna Fowles had been the last tenants, having vacated the premises in May of 2000. The State also submitted the processing information and Statement of Charges against Whiting, showing that Whiting had not provided any home address, as well as the intake facility processing information for Whiting, in which he listed his address as 39 Liberty Street, a copy of Whiting's arrest information showing his address as 609 North Ellwood Avenue, and a copy of Whiting's motor vehicle records showing he reported his home address as 550 Saint Mary's Street and 828 East Preston Street.

Detective Ronald Berger testified at the suppression hearing that when he visited the premises in April and May of 2001, the front door of 810 East Preston Street was sealed shut with either brick or boards while the rear door was unlocked. Berger could not recall whether the rear door's doorknob had a functioning lock, or if he had occasion to use any lights in the house. The Housing Authority of Baltimore City later confirmed that the meters for the electricity were never disconnected to the home, but that the electricity had not been used since 2000.

Detective Berger also identified photographs taken on April 27, 2001 of the premises which showed that the rear door to the 810 East Preston Street had a broken window in it with "some type of material patching behind the inside area of the broken glass" and that the rear door also had a bolt-type lock above the door knob. The photographs also showed a second floor rear bedroom with a green wall where Whiting had been staying; the room contained bedding on the floor, along with some "personal items about in the room," a television, and a

piece of plywood on the wall that appeared to cover a window. In another room on the second floor, distinguished by its white wall, there was also "some bedding" on the floor and a window frame with red trim covered by plywood. A May 4th photograph reflected the addition of a green trash can in the second floor rear bedroom with the green wall.

Robert Jones, also known as Crystal Whiting, also testified at the suppression hearing. Jones noted that he temporarily had been staying at 810 East Preston Street. He stated that he shared the second floor rear bedroom of the house with Whiting, and that approximately four other people also lived in the house. According to Jones, Whiting kept people out of the room by means of a lock on the door, for which Whiting had the only key. Jones acknowledged that he never paid rent for staying at 810 East Preston Street, nor did he ever have keys to the home. He stated that he gained admission to the house through the back door, which was always unlocked. Jones did not know, however, whether the other people who resided in the home had keys or how they entered the house because he did not "socialize" with them.

In ruling that Whiting lacked standing to challenge the searches, Judge Joseph P. McCurdy stated:

Well, I think as a matter of fact I can find that the property at issue in this case, which is 810 East Preston Street, is owned by the Housing Authority of Baltimore City. I find as a matter of fact that the property was not—there was no operable lease in effect regarding this property at the time of the search and seizure, or at the time the Defendant arguably occupied the premises, the last lease having expired in the year 2000. I find, as a matter of fact, and this is essentially admitted by the Defendant, that the Defendant was what would normally call [sic] a squatter in the abandoned property, or a trespasser in the . . . of the law. That Defendant had no rights to the property whatsoever, no possessory interest in the property at all that's recognized under the law, either the constitution, which would be a property right, or any statutory law or common law in Maryland. I find as a matter of fact that the Defendant

was occupying the property in some manner. And it's unclear if he was actually living there full-time, or whether he spent time there. It does appear that there was some personal property on the premises. There's no evidence that the property, the television, the bedding, and those items that belonged to the Defendant. The only evidence of any property belonging to Defendant that's been admitted is copies of the correspondence addressed to the Defendant at another address, and a copy of a registration form for Baltimore City Community College in the name of the Defendant at another address. There's evidence through the exhibits that the Defendant had other addresses at some point in the past. There's a Liberty Road address, I think there's another Mary Street address that was mentioned. I think that the conclusion here is that the Defendant, at some point, at some time, occupied this property as a trespasser. Now, this objective question of whether or not he had a reasonable expectation of privacy in the property, I suppose he did. Because I suppose he felt that he could have some privacy interest in that property if he could keep some things in there, he wasn't expecting the general public to walk in and out and to pick up his property. The other part of the issue though is society prepared to recognize that expectation of privacy, and I say it is not. Because the public policy of the City of Baltimore and the State of Maryland is to keep these properties vacant. In fact, the property owner who culpably allows their property to be occupied by squatters is himself in violation of the Baltimore City Housing Code. So the Defendant is trespassing on the property, is essentially committing a criminal act, although a very minor criminal act, and expecting to generate from that an expectation of privacy that society is prepared to recognize, and I do not agree with that principle. I note the closing statements and dissent in the case of Commonwealth versus Gordon, which is the Pennsylvania case cited by the State, and the closing words of the defense is; the poorest man may in his cottage bid defiance to all forces of the crown. It may be frail, its roof may shake, the wind may

blow through it, the storm may enter, the rain may enter, but the king of England cannot enter. All his force dares not cross this ruined tenement. Well that assumes that the Defendant has a right to be there to begin with. Simply stated, this is not his house. He did not have permission to be there, he was not authorized by the owner or anyone on the owner's behalf, he is a trespasser. So I'm going to grant the State's Motion regarding a lack of standing of the Defendant to challenge the search and seizure of 810 East Preston Street.

Thereafter, the jury found Whiting guilty of first degree murder, possession of a deadly weapon with the intent to injure, robbery with a deadly weapon, first degree assault, and theft, and not guilty of the charge of theft of property valued at greater than $500. Whiting later filed an unsuccessful motion for a new trial. On June 24, 2002, Whiting was sentenced to life imprisonment for the first degree murder conviction and to a consecutive twenty-five year term of incarceration for the conviction of robbery with a deadly weapon. For the purposes of sentencing, the first degree assault conviction was merged into the first degree murder conviction, and both the possession of a deadly weapon, and the theft convictions merged into the robbery with a deadly weapon conviction.

Whiting noted an appeal to the Court of Special Appeals, contending that the suppression court erred in denying his motion to suppress the fruits of the May 4th search of the bedroom at 810 East Preston Street and that the evidence was insufficient to sustain his convictions.[7] The Court of Special Appeals affirmed the conviction and, with respect to the standing issue, held that, "[b]ecause the Housing Authority could enter the premises or could permit anyone else to do so, and because [Whiting] had no right to exclude anyone from the premises . . . any expectation [Whiting] had that the police

---

7. The sufficiency issue is not before us as Whiting did not raise it in his Petition for Certiorari.

would not enter was unreasonable." *Whiting v. State,* 160 Md.App. 285, 304, 863 A.2d 1017, 1027–28 (2004).

## II. Standard of Review

In reviewing the grant of a motion to suppress evidence, we ordinarily consider only the evidence before the court at the suppression hearing, and not that of the record of the trial. *State v. Nieves,* 383 Md. 573, 581, 861 A.2d 62, 67 (2004); *Laney v. State,* 379 Md. 522, 533–34, 842 A.2d 773, 779–80 (2004); *State v. Green,* 375 Md. 595, 607, 826 A.2d 486, 493 (2003); *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439, 443–44 (2003). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the prevailing party on the motion. *Laney,* 379 Md. at 533–34, 842 A.2d at 779–80; *Green,* 375 Md. at 607, 826 A.2d at 493; *Dashiell v. State,* 374 Md. 85, 93, 821 A.2d 372, 376–77 (2003) (quoting *State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660, 663 (citing *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990))). Although we extend great deference to the hearing judge's findings of fact, we review independently the application of the law to those facts to determine if the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed. *See Laney,* 379 Md. at 533–34, 842 A.2d at 779–80; *Green,* 375 Md. at 607, 826 A.2d at 493; *Wallace v. State,* 373 Md. 69, 78, 816 A.2d 883, 888–89 (2003).

## III. Discussion

Whiting argues that he has standing under the Fourth Amendment to challenge the searches of 810 East Preston Street because he lived there and, therefore, had a legitimate expectation of privacy in the house. He argues that, although 810 East Preston Street was owned by the City of Baltimore, he kept possessions in a locked room in the home and there was no indication that the City had made any effort to remove him. Moreover, he notes that the City had kept the electricity on, reflecting its acquiescence to his presence in the home. Whiting iterates that an indigent's expectation of privacy in

the place where he or she stays should be acknowledged, just as the law respects the "millionaire's" right to privacy, because to do otherwise, would be to discriminate against the homeless and destitute.

Conversely, the State argues that the Court of Special Appeals properly affirmed the Circuit Court's ruling that Whiting lacked standing to contest the searches under the Fourth Amendment. The State alleges that Whiting has failed to provide any evidence of a right to exclude others from the house where he was residing or any other factor that could constitute a reasonable expectation of privacy. Moreover, the State contends that Whiting never held title to the premises, nor did he have permission from the owner of the home to be there. According to the State, as a squatter or trespasser in the vacant house, Whiting does not have an expectation of privacy that society would consider reasonable or legitimate.

## A. Standing Under the Fourth Amendment

 The Fourth Amendment of the United States, made applicable to the States by the Fourteenth Amendment, guarantees individuals the right to be secure in "their persons, houses, papers, and effects, against unreasonable searches and seizures." [8] *United States v. Stevenson*, 396 F.3d 538, 545 (4th Cir.2005); *Nieves*, 383 Md. at 583, 861 A.2d at 68; *Laney*, 379 Md. at 545, 842 A.2d at 786. The capacity to invoke Fourth Amendment protection requires the individual to establish that he or she maintained "a legitimate expectation of privacy" in the house, papers, or effects searched or seized. *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967); *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387, 401 (1978); *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538, 545–46 (1977); *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453, 459 (1971); *Laney*, 379 Md. at 545,

---

8. The Supreme Court made clear that the Fourth Amendment is applicable to the states through the Fourteenth Amendment in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

842 A.2d at 786; *Wallace,* 373 Md. at 79, 816 A.2d at 889; *Simpson v. State,* 121 Md.App. 263, 277, 708 A.2d 1126, 1133 (1998). Accordingly, to determine whether an individual has standing under the Fourth Amendment, we must examine whether the individual possessed a legitimate expectation of privacy in the effects or premises searched or seized, thereby implicating substantive rights protected by the Fourth Amendment.

The Supreme Court reconciled standing to challenge a search or seizure with the substantive rights protected by the Fourth Amendment in *Rakas,* 439 U.S. at 140, 99 S.Ct. at 429, 58 L.Ed.2d at 387, stating:

> [T]his Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing. Analyzed in these terms, the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.... [B]y frankly recognizing that this aspect of the analysis belongs more properly under the heading of substantive Fourth Amendment doctrine than under the heading of standing, we think the decision of this issue will rest on sounder logical footing.

*See also Ricks v. State,* 312 Md. 11, 26–27, 537 A.2d 612, 619–20 (1988). Thus, the question of whether an individual has standing under the Fourth Amendment is best analyzed in terms of the individual's substantive rights and requires us first to look at whether the individual invoking the Fourth Amendment possessed a legitimate expectation of privacy in the effects or place searched or seized.[9]

---

9. The history of standing under the Fourth Amendment was summarized in *Graham v. State,* 47 Md.App. 287, 421 A.2d 1385 (1980), in an

A legitimate expectation of privacy has been defined by the Supreme Court as:

> [M]ore than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence ... is "wrongful;" his expectation is not "one that society is prepared to recognize as 'reasonable.' "

*Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12, 58 L.Ed.2d at 401 n. 12 (citations omitted); *Ricks,* 312 Md. at 27, 537 A.2d at 620; *Graham,* 47 Md.App. at 293, 421 A.2d at 1389.

■ In order to evaluate the legitimacy of a privacy expectation, Justice Harlan, in a concurring opinion in *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967), formulated a two-prong test which requires that the person claiming protection under the Fourth Amendment must have exhibited an actual (subjective) expectation of privacy in the item or place searched, as well as have proven that the expectation is one that society is prepared to recognize as "reasonable." *Id.* at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587–88; *see also Smith v. Maryland,* 442 U.S. 735, 740, 99

---

opinion authored by Judge Wilner, who now sits on this Court, when he was on the Court of Special Appeals. After exploring its history, Judge Wilner succinctly opined:

> [T]he "standing" question is a preliminary one that should be resolved, for if appellant has no lawful right to contest the respective searches, the question of their validity becomes moot. Putting the cart before the horse may sometimes be easier to do, but it does make the ultimate journey considerably more difficult.
> When may a person be heard to complain that his Fourth Amendment right has been violated?

*Id.* at 291, 421 A.2d at 1387. Judge Wilner then answers his question by stating:

> The considerations here are not so simple as they may appear at first glance. Even under *Rakas,* the precepts of civil property law, though highly relevant, are not necessarily controlling. The legitimacy of one's expectation of privacy is in large measure a function of its reasonableness, and that, in turn, is determined to some extent by the elements of time, place, and circumstance.

*Id.* at 294, 421 A.2d at 1389.

S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226–27 (1979); *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986); *Laney,* 379 Md. at 545, 842 A.2d at 786–87; *Owens v. State,* 322 Md. 616, 626, 589 A.2d 59, 63 (1991); *Ricks,* 312 Md. at 27, 537 A.2d at 620. In a later case, *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), the Supreme Court embraced and further refined Justice Harlan's two-prong test to require that the person claiming protection under the Fourth Amendment must manifest a subjective expectation of privacy that is "objectively reasonable."

■ The question that delineates whether a defendant possesses a subjective expectation of privacy is "whether . . . the individual has shown that 'he seeks to preserve something as private.'" *Smith v. Maryland,* 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226 quoting *Katz,* 389 U.S. at 351, 88 S.Ct. at 516, 19 L.Ed.2d at 579. The Supreme Court found, for example, that the defendant had successfully met the subjective expectation criterion in *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210, 215 (1986), and *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). In *California v. Ciraolo,* the defendant challenged the search of his backyard by police. *Id.* at 209, 106 S.Ct. at 1810, 90 L.Ed.2d at 214. Observing that the defendant had surrounded his backyard by both a six foot high outer fence and a ten foot high inner fence, the Court noted, "[c]learly—and understandably—respondent has met the test of manifesting his own subjective intent and desire to maintain privacy as to his unlawful agricultural pursuits." *Id.* at 211, 106 S.Ct. at 1811–12, 90 L.Ed.2d at 215. In *Florida v. Riley,* 488 U.S. at 450, 109 S.Ct. at 696–97, 102 L.Ed.2d at 842, the defendant challenged a helicopter search of his greenhouse by the police, and the Court, noting the fact that two sides of the greenhouse were enclosed, and the other two obscured by trees and shrubbery, concluded that the defendant "no doubt intended and expected that his greenhouse would not be open to public inspection, and the precautions he took protected against ground-level observation." *Id.*

Despite being an integral part of the inquiry into whether the individual possessed a legitimate expectation of privacy, the Supreme Court nevertheless has remarked, that in some cases, the lack of a subjective expectation of privacy would not defeat a party's claim to a reasonable expectation of privacy. *United States v. Dunn,* 480 U.S. 294, 316, 107 S.Ct. 1134, 1147, 94 L.Ed.2d 326, 344–45 (1987); *Smith,* 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226–27. In fact, in *Smith v. Maryland,* the Court assumed that the defendant intended to maintain the privacy of the items searched and proceeded to measure the objective reasonableness of that expectation. 442 U.S. at 743, 99 S.Ct. at 2582, 61 L.Ed.2d at 228–29.

As to the second prong of the test, whether an individual's expectation is objectively reasonable, inquiry must be made into the substance of the defendant's claim that he or she possessed a legitimate expectation of privacy in the area searched. *Rakas,* 439 U.S. at 140, 99 S.Ct. at 430, 58 L.Ed.2d at 387; *Wallace,* 373 Md. at 81, 816 A.2d at 890. As the Supreme Court has explicated, in determining whether the individual's expectation is objectively reasonable, we must evaluate the pragmatics of the situation, and although concepts of real or personal property law, or understandings recognized and permitted by society, are to be taken into consideration, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like" are not controlling in the inquiry. *Rakas,* 439 U.S. at 140, 143, 99 S.Ct. at 430, 433, 58 L.Ed.2d at 387; *see also Wallace,* 373 Md. at 81, 816 A.2d at 890.

### B. The Maryland Experience

Before the application of the Fourth Amendment to the States in 1961, this Court as early as 1932 in *Baum v. State,* 163 Md. 153, 161 A. 244 (1932), clearly identified the sources from which an individual may derive a legitimate expectation of privacy in premises. In *Baum* we recognized that only those whose "private" rights have been violated can challenge the legality of a search and seizure:

[I]t is certain that one cannot complain of an illegal search and seizure of premises or property which he neither owns, nor leases, nor controls, nor lawfully occupies, nor rightfully possesses, or in which he has no interest. Or, stating it conversely, those whose private rights have been or may be disturbed alone may invoke the constitutional right against unreasonable search and seizure.

*Id.* at 157, 161 A. at 245. In *Baum*, police officers seized gambling paraphernalia from a house during a search, after calling and placing a bet with the person who answered the phone. *Id.* at 158, 161 A. at 246. Various defendants, not owners of the house, moved to suppress the evidence, but this Court denied the claim, "for the reason that the immunity from illegal search and seizure is a privilege personal to those whose rights thereunder have been infringed, and they alone may invoke it." *Id.* at 156, 161 A. at 245.

We further refined the concept of lawful occupancy of premises in *Resnick v. State*, 183 Md. 15, 36 A.2d 347 (1944), in which the police, pursuant to a search warrant, seized betting slips and other gambling accouterments. Various individuals, who claimed to have worked in the home for approximately a year, challenged the legality of the search and seizure. We determined that they failed to prove "that the property or possessions seized and searched were owned, leased, controlled or rightfully possessed by them or that they had any interest in them," and so lacked "a valid claim of lawful occupancy" in order to challenge the search warrant. *Id.* at 18, 36 A.2d at 348.

In *Lambert v. State*, 196 Md. 57, 75 A.2d 327 (1950), we explained that one must "lawfully occupy" the premises; mere presence is not sufficient:

[O]ne cannot complain of an illegal search and seizure of premises or property which he neither *owns*, nor *leases*, nor *controls*, nor *lawfully occupies*, nor *rightfully possesses*, or in which he has no *interest* 10. Only recently we cited the cases which followed that formula, and re-affirmed it as a positive statement of those who could complain. *Kapler v.*

*State*, 194 Md. 580, 71 A.2d 860. In all of these cases the words "lawfully occupies" are intended to be of the same nature and kind as the others used, and contemplate an occupation of some character which is connected with the property or the premises by some lawful means.... The occupancy must have some relation to the property or premises searched in order to enable such "occupants" to claim that their possessions have been unlawfully seized. It is not sufficient that they are merely there when the search is made. They must be there with some show of right to be in possession of the premises or property.

*Id.* at 64, 75 A.2d at 330 (emphasis in original); *see also Carter v. State*, 236 Md. 450, 453, 204 A.2d 322, 323 (1964) (holding that appellants had no standing to challenge search of car because they had "no ownership or possessory rights of any kind in the car."); *Ferguson v. State*, 236 Md. 148, 158–59, 202 A.2d 758, 763 (1964) (holding that Ferguson had no right to complain of search because he was not "in lawful possession of the property."); *Rizzo v. State*, 201 Md. 206, 209, 93 A.2d 280, 281 (1952) (concluding that defendants could not complain of search of apartment in which they had no interest but for illegal operations); *Saunders v. State*, 199 Md. 568, 573, 87 A.2d 618, 620 (1952) (noting that accused cannot contest search of property in which he had no right, title, or interest); *Lingner v. State*, 199 Md. 503, 505–06, 86 A.2d 888, 890 (1952) (holding that defendant could not complain of search and seizure of bags in which he disclaimed any ownership); *Frantom v. State*, 195 Md. 163, 167, 72 A.2d 744, 746 (1950) (concluding that owner could contest search of garage that he had leased out to another person).

Amidst this exploration of lawful occupancy and searches of premises, we also had the opportunity to address the two-prong test to evaluate the legitimacy of a claim of privacy articulated by Justice Harlan in his concurrence in *Katz* in *Venner v. State*, 279 Md. 47, 51–52, 367 A.2d 949, 952 (1977). In *Venner*, the defendant challenged the search and seizure of the contents of his bedpan during his stay in the hospital. *Id.* at 48–49, 950–51. We concluded that, "[u]tilizing the criteria

of Mr. Justice Harlan, we are of the view that Venner could not have had an 'expectation ... that society was prepared to recognize as "reasonable." ' " *Id.* at 59, 367 A.2d at 956.

This Court first applied Justice Harlan's two-prong test within the purview of standing to challenge the search of premises in *Ricks v. State,* 312 Md. 11, 537 A.2d 612 (1988), *disapproved on other grounds in Ragland v. State,* 385 Md. 706, 719, 870 A.2d 609, 617 (2005), where we iterated the premise in *Lambert, supra,* that "[i]t is not sufficient to establish standing, where challenged, merely to show that one was on the premises where a search occurs." Rather,

> [t]he focus of the inquiry is directed to the substance of the defendant's claim that he or she possessed a "legitimate expectation of privacy" in the area searched, ... "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like," are not controlling. *Rakas,* 439 U.S. at 140, 99 S.Ct. at 430, 58 L.Ed.2d at 387. The determination whether a legitimate expectation of privacy exists embraces two discrete questions ... the first is whether the individual, by his conduct, has exhibited a subjective expectation of privacy (that he seeks to preserve something as private), and the second question is whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable (whether the individual's expectation, viewed objectively, is justifiable under the circumstances).

*Id.* at 26–27, 537 A.2d at 619–20 (citations omitted). In *Ricks,* appellants challenged the video surveillance of an apartment where they had been conducting illegal sales of narcotics. *Id.* at 18, 537 A.2d at 615. In reviewing the appellants' claim to a legitimate expectation of privacy in the apartment, this Court concluded that:

> [W]hile appellants' counsel's assertion that the appellants were "invitees" did not constitute evidence, it was confirmatory of the apparent earlier concession by the prosecutor that the appellants were in the apartment at the invitation of the lessee. Moreover, there was an indication ... that

on several occasions . . . appellant Ricks, used a key to gain entrance, either to the building in which the apartment was located, or into the apartment itself. . . . [M]ere presence in another's apartment, without more, would not suffice to establish a legitimate expectation of privacy. More than mere presence, however, is arguably shown in this case.

Id. at 27, 537 A.2d at 619–20 (citations omitted). The Court in *Ricks* went on to find that, whereas appellants had standing to challenge the search, the search did not violate the Fourth Amendment. *Id.* at 27–28, 537 A.2d at 620.

In *State v. Sampson*, 362 Md. 438, 765 A.2d 629 (2001), Judge Wilner, speaking for this Court, adopted the refined two-prong test articulated in *California v. Greenwood*, 486 U.S. at 39, 108 S.Ct. at 1628, 100 L.Ed.2d at 36. In *Sampson*, the defendant challenged the search of trash that she had placed inside her yard, but also within reach from a municipal sidewalk. 362 Md. at 441, 765 A.2d at 630. We noted that the proper focus after *Greenwood* was whether the defendant's subjective expectation of privacy in her trash was objectively reasonable. *Id.* at 444–45, 765 A.2d at 632–33.[10]

---

**10.** We also had occasion in *Wallace v. State*, 373 Md. 69, 816 A.2d 883 (2003), to explore in *dicta* the concept of standing in the Fourth Amendment context, where Judge Cathell, writing for the Court, stated:

The United States Supreme Court has revisited its interpretation of an individual's "legitimate expectation of privacy" on several occasions. In *Rakas v. Illinois* . . . the Supreme Court further developed this analysis by minimizing the distinction between substantive Fourth Amendment analysis and Fourth Amendment standing.

*Id.* at 80, 816 A.2d at 889–90 (citations omitted). Judge Cathell went on to state:

The Supreme Court has subsequently articulated the *Rakas* two-step analysis as follows: "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373, 379 (1998) (quoting *Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 401–02 n. 12). *See also California v. Greenwood*, 486 U.S. 35, 39–40, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 36 (1988) (stating that "An expectation of privacy

This Court recently had the occasion to apply the objective reasonableness standard in *Laney v. State*, 379 Md. 522, 842 A.2d 773 (2004), within the context of lawful possession of premises. In *Laney*, the mortgagor of a home that had been foreclosed upon challenged several warrantless searches of the house where he had personal property. *Id.* at 527–28, 842 A.2d at 777. The searches occurred after title in the home had passed to the Department of Veteran Affairs ("V.A.")— the original guarantor of the mortgage. *Id.* Laney claimed that he had a legitimate expectation of privacy in the house under the Fourth Amendment despite the fact that title had passed to the V.A. because the V.A.'s ownership rights in the house were inferior to his "possessory and private rights" in the house. *Id.* at 534, 842 A.2d at 780. This Court determined that Laney had no reasonable expectation of privacy in the home because at the time of the searches the ownership of the property had passed to the V.A., which, accordingly, had authority to enter and possess the home. *Id.* at 527, 842 A.2d at 776. The facts found by the trial court, viewed within the "objectively reasonable" standard, rendered Laney's claim without merit.

### C. Squatters Nationwide

Some courts throughout the country, in trying to determine whether a "squatter" has standing under the Fourth Amendment, have asked whether the individual manifested an actual, subjective expectation of privacy in the place searched and whether his or her expectation was one that society is prepared to recognize as reasonable or legitimate. *United States v. Gale*, 136 F.3d 192, 195 (D.C.Cir.1998) (holding that squatter had no standing to challenge search of abandoned apartment which he had occupied "solely for the business of packing for distribution for narcotics."); *United States v. Whitehead*, 415 F.3d 583, 588 (6th Cir.2005) (holding that a

---

does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable").
*Id.* at 81, 816 A.2d at 890.

squatter had no standing to challenge search of vacant home he frequented "for the 'sole purpose of engaging in drug-related business transactions.' "); *United States v. Hunyady,* 409 F.3d 297, 301–02 (6th Cir.2005) (finding that Hunyady had no standing to challenge search of home he illegally entered because his presence was "wrongful."); *United States v. McRae,* 156 F.3d 708, 711 (6th Cir.1998) (determining that squatter had no standing to challenge search of abandoned home): *United States v. Dodds,* 946 F.2d 726, 728–729 (10th Cir.1991) (holding that squatter had no standing to challenge search of abandoned apartment because "hardly more than a fugitive presence would not be one that could be accepted by society."); *United States v. Ruckman,* 806 F.2d 1471, 1472 (10th Cir.1986) (finding that squatter had no standing to challenge search of cave where he had been staying for eight months); *Commonwealth v. Gordon,* 546 Pa. 65, 683 A.2d 253, 259 (1996) (holding that squatter had no standing to challenge search of abandoned house where he was staying); *State v. Linton,* 356 N.J.Super. 255, 812 A.2d 382, 383 (2002) (stating that "defendant, at best a transient squatter, had no constitutionally-reasonable expectation of privacy."); *Commonwealth v. Cameron,* 385 Pa.Super. 492, 561 A.2d 783, 787–88 (1989) (holding that squatter had no reasonable expectation of privacy, and therefore no Fourth Amendment standing to challenge search of abandoned structure); *Commonwealth v. Peterson,* 408 Pa.Super. 22, 596 A.2d 172, 178–79 (1991) (finding that squatter could not claim Fourth Amendment right to privacy in abandoned structure); *but cf. State v. Dias,* 62 Haw. 52, 609 P.2d 637, 639–40 (1980) (holding that squatters on state-owned land had standing to challenge search "consistent not only with reason but also with our traditional notions of fair play and justice.").

The only definitive circumstance, apparently, that has led to a different result where courts have considered societal policy, is that the owner of the premises had acquiesced in the "squatting." In *State v. Dias,* 62 Haw. 52, 609 P.2d 637 (1980), standing under the Fourth Amendment was accorded to the squatters because the squatters' presence was well-

known to the State, and had existed, without objection, for a considerable period of time. The premises searched were described as a "shack," a well lit structure built on stilts and attached to the side of an old bus, in an area recognized as "Squatters' Row," located on property owned by the State of Hawaii. *Id.* at 639. The Hawaii court concluded that:

> "Squatters' Row" on Sand Island has been allowed to exist by sufferance of the State for a considerable period of time. And although no tenancy under property concepts was thereby created, we think that this long acquiescence by the government has given rise to a reasonable expectation of privacy on the part of the [squatters], at least with respect to the interior of the building itself.

Id. at 640.[11]

In addition to those courts which have invoked policy grounds to deny standing to "squatters," other courts have merely questioned whether a squatter could have a legitimate expectation of privacy in the premises searched. *See Amezquita v. Hernandez–Colon,* 518 F.2d 8, 11–12 (1st Cir. 1975) (stating that squatters on public land could not avail themselves of Fourth Amendment protection); *State v. Gilmore,* 324 Mont. 488, 104 P.3d 1051, 1055 (2004) (holding that trespasser did not have expectation of privacy in bedroom where he did not pay rent and had been asked to leave); *State v. Cruz,* 15 Kan.App.2d 476, 809 P.2d 1233, 1240 (1991) (finding that Fourth Amendment was not applicable to trespasser in house); *People v. Sumlin,* 105 Misc.2d 134, 431 N.Y.S.2d 967, 970 (N.Y.Sup.Ct.1980) (determining that guest of squatter did not have Fourth Amendment rights in apartment where squatter was staying).

---

**11.** New York courts apparently have also recognized the concept of acquiescence but have yet to hold that a plaintiff has successfully demonstrated acquiescence by the landowner. *See Walls v. Giuliani,* 916 F.Supp. 214, 221 (E.D.N.Y.1996) ("[I]f plaintiffs can prove the acquiescence and toleration that they allege, they are not trespassers and they have a possessory interest that enjoys some degree of legitimacy under New York law.").

Other courts, like this Court, utilizing the objectively reasonable standard, have determined that "squatters" do not have standing to challenge the legality of a search of the premises in which they stayed. *See Zimmerman v. Bishop,* 25 F.3d 784, 788 (9th Cir.1994) (concluding that Fourth Amendment rights of guest of squatter were not violated by search of shack on another's property); *Davis v. State,* 119 S.W.3d 359, 367 (Tex.App.2003) (holding that squatter in home did not have standing to challenge search of house where he was staying); *Woodson v. Commonwealth,* 25 Va.App. 621, 491 S.E.2d 743, 745 (1997) (finding that trespasser lacked standing to claim protection of the Fourth Amendment in premises from which he had been barred).

### D. The Searches of 810 East Preston Street

▮ The first question to be addressed is whether Whiting had a subjective expectation of privacy. Although courts have assumed in the context of standing that the defendant had a sufficient expectation of privacy in order to reach the second issue, whether an objective expectation existed, *Ruckman,* 806 F.2d at 1472 ("We shall assume that Ruckman entertained a subjective expectation of privacy, i.e. absent a search warrant or probable cause or exigent circumstances . . . his cave could not be searched."), we need not so assume because Whiting manifested his desire to maintain privacy in the second floor rear bedroom. The trial court found that Whiting was occupying 810 East Preston Street "in some manner," and that he kept some personal property on the premises, specifically correspondence addressed to or from Whiting and a college registration form. Whiting kept people out of the bedroom with the green wall by means of a lock on the door for which only he had the key. Whiting clearly sought to preserve the room as at least semi-private, and, therefore, demonstrated that he possessed a subjective expectation of privacy in the room.

▮ Was Whiting's subjective expectation of privacy objectively reasonable? *Laney,* 379 Md. at 545, 842 A.2d at 787. Drawing from *Baum* and its progeny we look at the following

factors to determine objective reasonableness: whether the individual owned, leased, controlled, lawfully occupied, or rightfully possessed the premises searched. *Baum*, 163 Md. at 157, 161 A. at 245; *Resnick*, 183 Md. at 18, 36 A.2d at 348; *Lambert*, 196 Md. at 64, 75 A.2d at 330; *Carter*, 236 Md. at 453, 204 A.2d at 323; *Ferguson*, 236 Md. at 158–59, 202 A.2d at 763; *Rizzo*, 201 Md. at 209, 93 A.2d at 281; *Saunders*, 199 Md. at 573, 87 A.2d at 620; *Lingner*, 199 Md. at 505–06, 86 A.2d at 890; *Frantom*, 195 Md. at 167, 72 A.2d at 746.

Turning to the first factor, it is uncontested that Whiting did not own 810 East Preston Street [12]—the house was owned by the Housing Authority of Baltimore City.[13] Secondly, Whiting was not a lessee of the house or even a lessee of the second floor rear bedroom, as evidenced by the fact that the home was last leased by the City in 2000, and the last tenants vacated in May of that year.[14]

Nevertheless, Whiting contends that he established an ability to exclude others from the second floor rear bedroom by

---

**12.** Whiting cites *State v. Adams*, 197 Ariz. 569, 5 P.3d 903, 904 (2000), in support of his claim. In *Adams*, the court found that the defendant had a reasonable expectation of privacy in his second floor apartment, despite the fact that the apartment itself constituted a zoning violation. *Id.* In so holding, the court relied on the fact that Adams legally owned his building and enjoyed the right to exclude anyone he wished from the property. *Id.* at 907. Because Whiting was not the owner of 810 East Preston Street, *Adams* is inapplicable.

**13.** Even if Whiting had squatted there for the appropriate period of time, he could not avail himself of the doctrine of adverse possession because the property is owned by the City of Baltimore. *Siejack v. City of Baltimore*, 270 Md. 640, 644, 313 A.2d 843, 846 (1974) ("Quite likely nothing is more established than the rule that title to property held by a municipal corporation in its governmental capacity ... cannot be acquired by adverse possession.").

**14.** Whiting also relies on *Community for Creative Non-Violence v. United States Marshals Service*, 791 F.Supp. 1 (D.D.C.1992). *Community for Creative Non-Violence* ("*CCNV*") involved an early morning raid of a homeless shelter. *Id.* In finding that CCNV had a reasonable expectation of privacy in the homeless shelter, the court noted that CCNV was "the exclusive licensee of the shelter." *Id.* at 3–4. Unlike the corporation in *CCNV*, Whiting was not a licensee, or lessee, of 810 East Preston Street.

virtue of the lock on the door, thereby demonstrating control over the premises. Whiting relies on a Pennsylvania Supreme Court opinion, *Commonwealth v. Gordon*, 683 A.2d at 258, to support his assertion that the right to exclude others from the premises is a critical characteristic of de facto ownership.[15] In *Gordon*, a police officer investigating a purse snatching searched the dining room of an abandoned house, the rear door of which was open and falling off its hinges. *Id.* at 255. The officer found the defendant in the dining room, which was closed off from the rest of the house by a sheet hanging in the doorway and which contained a lamp, a television on a milk crate, and a "beer ball." *Id.* The defendant claimed that the sheet hanging in the dining room doorway was proof that he excluded others from the dining room. *Id.* at 258. The court concluded that the defendant's "claimed exclusion of the public from the dining room is implausible because the evidence revealed that the house had an unlocked, exterior door." *Id.* at 258. Whiting, nevertheless, contends that his case is much stronger than that in *Gordon* because Whiting placed a lock on the door to the bedroom and whenever he left the bedroom door unlocked, Robert Jones was in the room to prevent anyone from entering. In this case, however, 810 East Preston Street, like the premises in *Gordon*, also had an unlocked, exterior door, the back door to the house, a fact that the Pennsylvania Court found controlling, and the front door was boarded to exclude even Whiting.

Moreover, to "control" something is "to exercise restraint or direction over" it. Random House Dictionary of the English Language 442 (2d ed. unabridged 1987). In the present case, Whiting shared the second floor rear bedroom with Robert Jones, and shared the entire house with four or more strang-

---

**15.** The power to exclude others is not synonymous with the right to exclude others. To have the power means to have the "ability to do or act; capability of doing or accomplishing something," Random House Dictionary of the English Language 1516 (2d ed. unabridged 1987), whereas to have the right means to have "a just claim or title, whether legal, prescriptive, or moral." Random House Dictionary of the English Language 1656 (2d ed. unabridged 1987).

ers. Sharing dominion over the premises ordinarily does not reflect exclusive control. *See Rakas*, 439 U.S. at 143, 99 S.Ct. at 430, 58 L.Ed.2d at 402 (noting that "[o]ne of the main rights attaching to property is the right to exclude others ... and one who ... controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude."). As noted, the special power to exclude is not the same as the right to exclude.

Most importantly with respect to control, even though Whiting maintained a lock on the bedroom door, he could have been removed by the City at any time. *See Gilmore*, 104 P.3d at 1055 (finding that defendant had no expectation of privacy in bedroom, despite the fact that he kept the door locked and the home owner did not have the key or any right to access the bedroom); *Davis*, 119 S.W.3d at 367–68 (holding that defendant staying in abandoned house had no legitimate expectation of privacy in the house despite having a key to the house and the ability to let people in and out of it).[16]

With respect to rightful possession or lawful occupancy of 810 East Preston Street, Whiting argues that he was a lawful occupant because the City had acquiesced to his presence in 810 East Preston, which, he argues, was demonstrated by the fact that the Housing Authority made no effort to remove him from the premises and had not shut off the electricity in the house. "Acquiesce" is defined as "to assent tacitly; submit or comply silently or without protest; agree; consent." Random House Dictionary of the English Language 18 (2d ed. unabridged 1987). Knowledge and consent are elements of acquiescence. *See Dias*, 609 P.2d at 639–40 (finding that the State of Hawaii knew of the existence of "squatters' row" and allowed it to exist.). Whiting has failed to demonstrate in this case that the City knew of his presence at 810 East Preston Street and that it consented to his presence.

---

**16.** Whiting cites to *Commonwealth v. Govens*, 429 Pa.Super. 464, 632 A.2d 1316 (1993). In *Govens*, the court emphasized the fact that the state had failed to contest standing in the trial court and had not established a sufficient record for a finding of lack of standing.

Whiting, nevertheless, analogizes his situation to defendants who successfully challenged searches of tents they themselves constructed, citing *United States v. Sandoval*, 200 F.3d 659, 661 (9th Cir.2000), *United States v. Gooch*, 6 F.3d 673, 677 (9th Cir.1993), and *Kelley v. State*, 146 Ga.App. 179, 245 S.E.2d 872, 874 (1978). In *Sandoval*, 200 F.3d at 661, the court found that the defendant possessed an objectively reasonable expectation of privacy in the tent where he was staying on federally owned land. Although it was questionable whether the defendant had permission to do so, the court stated:

> [C]amping on public land, even without permission, is far different from squatting in a private residence. A private residence is easily identifiable and clearly off-limits, whereas public land is often unmarked and may appear to be open to camping. Thus, we think it much more likely that society would recognize an expectation of privacy for the camper on public land than for the squatter in a private residence.

*Id.* at 661. *Gooch*, 6 F.3d at 677, involved the search of the defendant's tent, but in a state campground, so that the Ninth Circuit Court opined:

> We have already established that a person can have an objectively reasonable expectation of privacy in a tent on private property. *LaDuke v. Nelson*, 762 F.2d 1318, 1326 n. 11, 1332 n. 19 (9th Cir.1985). *Accord LaDuke v. Castillo*, 455 F.Supp. 209 (E.D.Wash.1978). This reasonable expectation is not destroyed when a person's tent is pitched instead on a public campground where one is legally permitted to camp.

*Id.* at 677. *Kelley*, 245 S.E.2d at 875, also involved a search of a tent but one apparently on private property—owned by a relative of two of the defendants—upon which law enforcement officers had "trespassed." All three cases are distinguishable because a public campground "invites" tent dwellers and clearly 810 East Preston Street, although publicly owned, did not invite inhabitants, and there is no element of police

misconduct in effecting the search.[17]

Finally, Whiting asserts that we should acknowledge an indigent's expectation of privacy in the place where he or she stays because to not do so is to discriminate against indigents and the homeless in favor of people who are fortunate enough to have money. A person's monetary worth, however, is not the issue; the issue is lawful occupancy.

Whiting neither lawfully owned, leased, controlled, occupied, nor rightfully possessed 810 East Preston Street, or any part of the premises therein. Accordingly, we find that Whiting lacked standing to challenge the April 27 and May 4, 2001 searches because, although he may have possessed a subjective expectation of privacy, that expectation was not objectively reasonable.

## *JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED WITH COSTS.*

Chief Judge BELL joins in the judgment only.

---

**17.** Lastly, Whiting also cites to *People v. Smith,* 113 Misc.2d 176, 448 N.Y.S.2d 404, 406 (N.Y.Sup.Ct.1982) and *State v. Mooney,* 218 Conn. 85, 588 A.2d 145, 153 (1991) to support his claim. In *People v. Smith,* the issue only was whether the trial court should hold a hearing regarding standing when the defendant alleged he paid rent to one who may have been a squatter. The trial court recognized that "a squatter does not have any basic legal right to an apartment." *Id.* at 406. In *Mooney,* the court found that the defendant had a reasonable expectation of privacy in his closed duffel bag and cardboard box, but did not address the issue of whether he had a reasonable expectation of privacy in the premises-the bridge abutment-where those items were located. 588 A.2d at 153.