COMMUNITY FOR CREATIVE NON-
VIOLENCE, et al., Plaintiffs,

v.

UNKNOWN AGENTS OF the UNITED
STATES MARSHALS SERVICE,
et al., Defendants.

Civ. A. No. 92–0199.

United States District Court,
District of Columbia.

May 5, 1992.

Margaret M. Zwisler, Lois G. Williams, Richard A. Ripley, Howrey & Simon, Washington, D.C., for plaintiffs.

Jay Stephens, John C. Cleary, Office of the U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

Plaintiffs are the operators and nearly 500 occupants of a homeless shelter in Washington, D.C. They bring this action under both 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution. Plaintiffs claim that the Defendants violated their rights in conducting an early morning "raid" on the homeless shelter in the process of executing an arrest warrant.

This case comes before the Court on the Defendants', United States Marshals' ("Marshals"), Motion to Dismiss. *See* Fed. R.Civ.P. 12(b)(6). The facts as alleged in Plaintiffs' complaint do state a violation of the Plaintiffs' Fourth Amendment rights. Therefore, this Court will deny the Defendants' Motion to Dismiss the Plaintiffs' constitutional claims.[1]

## FACTUAL BACKGROUND

In ruling on a motion to dismiss, the Court must construe the complaint in the light most favorable to the Plaintiffs and take their allegations as true. *McGowan v. Warnecke,* 739 F.Supp. 662 (D.D.C.1990). The facts as alleged in Plaintiffs' complaint are as follows.

The Community for Creative Non–Violence ("CCNV") operates a homeless shelter at 425 Second Street, N.W. Washington, D.C. Approximately seventy (70) CCNV members reside in and operate the homeless shelter. In addition, in the early morning hours of January 9, 1992 nearly 500 homeless people were sleeping in the shel-

---

1. However, because this Court finds that the Marshals were acting under color of federal law, the Plaintiffs' Section 1983 claim will be dismissed. *See, Richardson v. U.S. Dep't of the Interior,* 740 F.Supp. 15, 20 (D.D.C.1990). Indeed, the arrest warrant itself in this case was addressed to "the United States Marshal or any other authorized federal officer ..."

ter, having spent the previous winter night there.

At approximately 5:30 a.m. on January 9, 1992 ten to twenty (10–20) Agents of the United States Marshals Service for the Superior Court of the District of Columbia came through the entrance of the CCNV shelter at 425 Second Street. One of the Agents showed a CCNV member stationed at the front lobby a photograph of a person he claimed to be Earl Hughes. Hughes was a fugitive for whom the Marshals had an arrest warrant issued by the D.C. Superior Court. The Defendants only described Hughes as a black male of medium complexion, medium height, and medium build.

No CCNV representative gave the Marshals consent to enter the shelter to search for Hughes. The Marshals, however, entered nonetheless and broke up into two groups to search the two larger areas of the shelter. One group proceeded to the drop-in section in the basement of the CCNV shelter. The purpose of this area is to provide emergency overnight shelter for homeless individuals. On this particular January night, there were 157 members of the Plaintiff class who were sleeping in the drop-in section.

The entrance to the drop-in section is locked at night and monitored by a CCNV staff member. One of the Defendants knocked on the outer steel mesh door and presented a photograph of Earl Hughes. The CCNV member opened the door to take a closer look at the photograph and the Defendants pushed their way through the door and into the drop-in section of the shelter. They then proceeded to check the shelter's roster, and discovered that no one had checked into the shelter under the name of Earl Hughes. Nevertheless, the Marshals woke up the 157 members of the plaintiff class who were sleeping in the drop-in section. Some members were roused at gunpoint. *See* Plaintiff's Motion for Preliminary Injunction at 3.

The Marshals then checked each individual against the picture they had of Earl Hughes. After that, the Defendants ordered all 157 people sleeping in the drop-in area to produce photo identification or give a name and date of birth. The Defendants said that any person who failed to comply with this order would not be permitted to leave the shelter. The Marshals then stationed themselves at the only unalarmed exit to the section.

In addition to the picture of Hughes, the Defendants had brought with them into the shelter a computer printout of several thousand names of individuals in the District of Columbia metropolitan area with outstanding criminal arrest warrants. The Marshals then began checking the identification of each member of the Plaintiff class against the computer printout. One Marshal stated that any member of the Plaintiff class who did not produce identification would be taken into custody. The Defendants also threatened to arrest Plaintiff Carol Fennelly, a CCNV director, if she interfered with this process.

Simultaneous to the events in the drop-in section, the second group of Marshals proceeded to the 2 South section of the shelter. That section houses male residents who are employed. In the early morning of January 9, 1992 there were 331 class members who had been sleeping in 2 South for the night.

At the entrance to 2 South the Marshals again displayed the picture of Earl Hughes but were informed by the staff member on duty that the man in the photograph was not in that section of the shelter. The Defendants also checked the sign-in roster and did not find Hughes' name. Nevertheless, the Defendants ordered that the public address system be used to wake up the 331 residents of 2 South and to announce that they line up and display identification. At least one Plaintiff class member was roused out of bed at gunpoint and several were pulled out of the bathroom.

One CCNV officer attempted to intervene and asked the Marshals whether they had a search warrant. The Marshals responded by simply referring to a computer printout of thousands of names similar to the one used in the drop-in area. The Marshals then stationed themselves at all exits and informed the occupants of 2 South that they would not be permitted to leave the

section, go to the bathroom, or return to sleep until they had identified themselves. The Marshals then checked the identities of the 2 South occupants against their copy of the computer printout. Out of the 500 people checked, five fugitives were found and arrested. Hughes was not found in either room of the shelter.

On the way out of the shelter Defendant Floyd White advised Plaintiff Fennelly, "we might be here again tomorrow. Have the doors locked and that can come down." Complaint at ¶ 34. CCNV also alleges that a similar "raid" occurred in December of 1990. *Id.* CCNV and the class of individuals who were in the shelter that night brought this action asking for injunctive relief from such conduct in the future.

## DISCUSSION

### A. *Standing*

■ CCNV, Fennelly, and the class of homeless people who occupied the shelter that night have alleged sufficient "injury" to establish standing. *See Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). CCNV is a corporation licensed by the District of Columbia to operate the shelter at issue in this case. Fennelly, an officer and director of CCNV, and approximately seventy other CCNV members were residing at and administering the homeless shelter on January 9, 1992. CCNV, in its capacity as the operator of the shelter, raises funds for the administration of the shelter, makes rules for its occupants, and determines who to admit into the shelter.

■ Unquestionably the injury that CCNV has alleged as a result of Defendants' conduct is both real and substantial. Complaint at ¶ 44–46. As the exclusive licensee of the shelter, CCNV had the authority to exclude people from entering the premises. Fennelly and other CCNV members lived there. Thus, the alleged illegal search and seizure which occurred there infringed on an area in which CCNV had a reasonable expectation of privacy. *See Rakas v. Illinois*, 439 U.S. 128, 143–144 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387

(1978). In addition, CCNV's fundraising capability has been damaged by the allegation that the CCNV shelter is a harbor for fugitives. The homeless people who were residing at the shelter at the time of the alleged raid also have standing to assert violations of their own rights. It is beyond cavil to claim that the very individuals who were allegedly roused in the early hours of the morning did not sustain the type of injury necessary to confer standing in this case.

■ In addition, CCNV has standing to assert the interests of the homeless people who were at the shelter when the raid occurred. *See Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). CCNV, as the operator of the shelter, shares a special interest in the privacy and the safety of the homeless people who stay there. Indeed, CCNV alleges that its ability to run the shelter has been damaged because the Defendants' conduct has "jeopardized the relationship of trust between CCNV and the residents" and "discourag[ed] homeless persons from using the shelter." *Id.* at ¶ 44. Thus, without preserving the Fourth Amendment rights of the homeless people who rely on the shelter, it would be impossible for CCNV to fulfill its primary purpose—providing reliable and safe shelter for the homeless.

■ In addition to meeting the "injury" requirement, the Plaintiffs have standing to seek injunctive relief against the Defendants to redress their injury. The Defendants maintain that they acted in this case pursuant to their "policy for executing arrest warrants" as it applies to the CCNV shelter. *See* Defendants' Motion at ¶ 48. Because they were acting in accordance with an official policy of a federal law enforcement agency, there is a strong likelihood that Defendants actions will recur. *See LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir.1985) (migrant farm workers had standing to sue to enjoin illegal INS searches). In addition, the same people who were at the shelter on the night in question are likely to be affected by the future actions of the Marshals, either because they will sleep in the shelter again or

because they will avoid the shelter under the threat of future illegal searches. *See Goff v. Nix,* 803 F.2d 358 (8th Cir.1986) (prisoners have standing to challenge illegal prison searches).

Given these alleged injuries, the Plaintiffs have the right to prove that the conduct of the Defendants violated their fourth amendment rights. In addition, the Plaintiffs have alleged that the Marshals have conducted similar "raids" in the past and actually threatened on January 9, 1992 to repeat their conduct in the future. Therefore, because a federal court injunction might be necessary to redress the alleged harm to the Plaintiffs, they cannot be denied standing to prove that they are entitled to such relief.

### B. *Fourth Amendment Claim*

Many of the concepts which have previously defined the scope of the Fourth Amendment are tied to traditional notions of "home." Tragically, however, the Plaintiffs in this case are among the growing number of our nation's homeless citizens. This Court, then, is faced with the challenge of "interpreting the Fourth Amendment in light of contemporary norms and conditions." *Payton v. New York,* 445 U.S. 573, 591 n. 33, 100 S.Ct. 1371, 1382–83 n. 33, 63 L.Ed.2d 639 (1980). Cognizant of both the new challenges which homelessness presents to effective law enforcement and the necessity that the rights secured by our Constitution apply with equal force to this growing segment of the citizenry, this Court applies the bedrock principles of the Fourth Amendment to the facts of this case.

■ It is clear that a homeless person does not receive any greater Fourth Amendment rights than a citizen who has a home. Therefore, an individual who is a fugitive from justice cannot receive any extra protection from arrest merely by virtue of the fact that he does not have a permanent residence.

■ The Supreme Court has held that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton,* 445 U.S. at 603, 100 S.Ct. at 1388. Thus, when there is an arrest warrant issued for a person with a known residence, the police may search for that person in his residence provided they have reason to believe he is home. Similarly, if an arrest warrant is issued for a person without a home, the police cannot be prevented from carrying out reasonable searches for that person if there is a reasonable bona fide belief as to where he might temporarily be residing at that particular time, even if it is at a homeless shelter. *Payton* authorizes the police to execute an arrest warrant for a homeless person at a shelter, but only insofar as such execution is consistent with that particular person's use of that shelter as his or her home. If that were not the case, then homeless fugitives could, in effect, force the police to satisfy more stringent procedural requirements than are necessary to apprehend fugitives who are not homeless.

■ It is equally clear, and decisive in considering the alleged facts before the Court, that homeless people do not have any lesser rights under the Fourth Amendment than those who have homes. Therefore, a person who stays at a homeless shelter because he cannot obtain other housing does not do so at the loss of his most basic rights of privacy and freedom from unreasonable government intrusions.

■ This Court first rejects the Government's argument that normal Fourth Amendment principles do not apply here at all because the Plaintiffs have no "legitimate expectation of privacy" inside a homeless shelter owned by the District of Columbia. Such strict property notions run contrary to the idea that what a person "seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511–12, 19 L.Ed.2d 576 (1967) (legitimate expectation of privacy for conversation in public phone booth). The correct inquiry is twofold, namely, 1) what is an individual's actual expectation of privacy in a particular

6

place and, 2) is society prepared to recognize that expectation as reasonable. *Id.* at 361, 88 S.Ct. at 516–17 (Harlan, J. concurring).

■ The occupants of this homeless shelter had an actual expectation of privacy. For many of the Plaintiffs their choice was between the homeless shelter and the streets. Thus, the shelter was, for them, the most private place they could possibly have gone—the place most akin to their "home." That expectation of privacy is a reasonable one. To reject this notion would be to read millions of homeless citizens out of the text of the Fourth Amendment. *See* Michael D. Granston, Note, *From Private Places to Private Activities: Toward a New Fourth Amendment House for the Shelterless*, 101 Yale L.J. 1305, 1320–1321 (1992) ("denying Fourth Amendment protection to [shelterless] areas ... is tantamount to denying the shelterless any area where they may be free from governmental searches.") Furthermore, courts have long recognized "the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." *Rakas*, 439 U.S. at 142–143, 99 S.Ct. at 429–30. Thus, the Constitution does not contemplate a society in which millions of citizens have no place where they can go in order to avail themselves of the protections provided by the Fourth Amendment.

■ Having decided that the Fourth Amendment applies to a search of the homeless shelter, it is clear that the facts as alleged in the complaint state a valid claim. The Marshals had an arrest warrant for one individual they incorrectly suspected was inside the shelter. While that warrant gives law enforcement officials certain rights to conduct reasonable searches for that one individual, those searches may not impermissibly infringe on the privacy of innocent third persons. *See Steagald v. United States*, 451 U.S. 204, 212–213, 101 S.Ct. 1642, 1647–48, 68 L.Ed.2d 38 (1981); *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 ("a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

CCNV's shelter was invaded and nearly 500 innocent individuals were roused from their sleep at 5:00 a.m.—some at gunpoint—detained, and forced to identify themselves before they could leave or return to sleep. The Marshals did not have a comprehensive search warrant or consent to search the shelter or to question the 500 other individuals in the manner Plaintiffs allege. They certainly did not have the right to go into the shelter to attempt to execute thousands of outstanding arrest warrants with absolutely no cause to believe that any of the fugitives were inside the shelter. Thus, given the facts alleged in the Complaint, this Court is unwilling to say that Plaintiffs' Fourth Amendment rights have not been violated. The Defendants' Motion to Dismiss is denied.

A separate Order accompanies this opinion.

### ORDER

Upon consideration of the entire record in the above-captioned matter, the Defendants' Motion to Dismiss, and the Plaintiffs' opposition thereto it is this 4 day of May, 1992 hereby

ORDERED that the Defendants' Motion to Dismiss is GRANTED with respect to Count I of the Complaint and it is

FURTHER ORDERED that the Defendants' Motion to Dismiss is DENIED with respect to Count II of the Complaint.