People v Maquila (2025 NY Slip Op 25270)

[*1]

People v Maquila

2025 NY Slip Op 25270

Decided on December 17, 2025

Supreme Court, Kings County

King, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on December 17, 2025
Supreme Court, Kings County

The People of the State of New York

against
Raymond Maquila, Defendant.

IND-75016-23

Edward H. King, J.

The defendant is charged with Criminal Sexual Act in the First Degree (PL § 130.50[1]) and other related charges as listed on the indictment.
On August 14, 2024, the court conducted a combined Dunaway /Huntley/Payton hearing. At the hearing, the People offered the testimony of two witnesses, New York City Police Department (NYPD) Detectives Deidre Chiarantano and Destiny Avila. Defendant testified at the hearing.
I. Statement of Facts
A. Detective Deidre Chiarantano
Detective Chiarantano has been with the NYPD for over 14 years and is assigned to the Staten Island Warrant Squad. After the police academy the detective was assigned to Midtown South in Manhattan and then to the 72nd Precinct in Brooklyn, and then the Brooklyn South Warrant before the current assignment. While at the Brooklyn South Warrant Squad, the detective then officer had duties and responsibilities which included looking for individuals that were wanted in both supreme and criminal court, as well as individuals identified in complaint reports.
On July 17, 2023, detective Chiarantano, was assigned to the Brooklyn South Warrant Squad, when she was assigned a probable cause to arrest I-card for the defendant. The following day, on July 18, 2023, Chiarantano spoke with Detective Davila who indicated the defendant is wanted for one of two complaints against the same victim. After receiving that information, the officer contacted the Department of Homeless Services and discovered the defendant resides at Safe Haven, a shelter in Brooklyn located at 821 Clarkson Avenue. The officer then went to the shelter with her partners, detectives Lagatolla and D'esposito. At the location, the officers were informed by Ms. Baker, a site manager, that shelter is a transitional homeless shelter for men and women. Ms. Baker also provided a room number for the defendant at the facility and led the officers to the defendant's room. The defendant answered the door, asked for time to change his clothes then exited the room at which point he was put in custody. The defendant was transported to the 77th precinct.
B. Detective Destiny Avila
Detective Avila testified she interviewed the complainant on July 15, 2023, at the Brooklyn Special Victims Office, located at 653 Grand Avenue. The complainant informed the detective that she was sexually assaulted on two occasions by the defendant at a hotel in Kings County. She then conducted a controlled call between the complainant and defendant, where the complainant provided consent to record the phone call for the purpose of the investigation. Prior to the call, the detective activated a probable cause I-card. On July 17, 2023, Detective Avila conferred with Detective Chiarantano and on July 18, 2023, the defendant was arrested.
C. Raymond Maquila
Defendant testified that he lived at Safe Haven in July 2023. That he knew the employees had access to his room, and that employees of the facility worked in the lobby of the building. The defendant testified that on July 18, 2023, after ignoring two knocks at the door, he observed a group of people entering his room, and that he did not recognize any of them to be from Safe Haven, including Ms. Baker. He stated the individuals identified themselves as police officers after they entered his room. At which point he asked if they had a warrant and was shown a paper with what he believed to be a mugshot.
At the precinct he was asked if he knew the complainant and he told the officers he did not. He testified he was not provided with Miranda warnings prior to those questions.

II. Conclusions of Law
Defendant argues that the People have failed to demonstrate a sufficient legal basis for the entry into the subject premise, and therefore any evidence that flows from that unlawful entry must be suppressed. The People argue that the police's conduct was reasonable, justified and lawful.
A. Credibility
Having observed the testimony of Detectives Chiarantano and Avila as well as the defendant, the court concludes that their testimony was credible.
B. Dunaway
For the Dunaway portion of this hearing, the initial burden of proof rests with the People to put forward credible evidence tending to show that law enforcement acted lawfully. The defendant then has the burden of proving by a preponderance of the evidence that the police acted unlawfully (see People v. Baldwin, 25 NY2d 66 [1969]; People v. Parker, 180 AD3d 1072 [2d Dept. 2020]. The court must determine whether the police action was "justified at its inception and whether it was reasonably related in scope to the circumstances which justified the interference in the first place" (People v. Wheeler, 2 NY3d, 370, 374 [2004]). Implicit in the People's burden is that the testimony and evidence offered must be credible (People v. Harris, 192 AD3d 158 [2020]).
As the court outlined in People v. McRay, (infra) probable cause to arrest requires, not proof of guilt beyond a reasonable doubt or evidence sufficient to warrant a conviction, but merely information which would lead a reasonable person who possess the same expertise as the officer to conclude, under the circumstances, that a crime is being or was committed (People v. McRay, 51 NY2d 594, 601 [1980]).
i. "Fellow Officer" Rule
Even if an arresting officer lacks personal knowledge sufficient to establish probable cause, the arrest will be lawful if the officer "acts upon the direction of or as a result of communication with a superior or [fellow] officer or another police department provided that the police as a whole were in possession of information sufficient to constitute probable cause to [*2]make the arrest." (People v Horowitz, 21 NY2d 55, 60, 286 NYS2d 473, 233 NE2d 253; People v Rosario 78 NY2d 583, 588, 578 NYS2d 454, 585 NE2d 766, cert denied 502 US 1109, 112 SCt 1210, 117 Led2d 448; People v Lypka, 36 NY2d 210, 213, 366 NYS2d 622, 326 NE2d 294).
The People have the burden to "establish that the officer or agency imparting the information, in fact possessed the probable cause to act." (People v Rosario, supra, at 588, 578 NYS2d 454, 858 NE2d 766; People v Dodt, 61 NY2d 408, 416, 474 NYS2d 441, 462 NE2d 1159, People v Landy, 59 NY2d 369, 375, 465 NYS2d 857, 452 NE2d 1185).
Detective Avila testified she interviewed the complainant on July 15, 2023, at the Brooklyn Special Victims Office where the complainant informed the detective that she was sexually assaulted on two occasions by the defendant at a hotel in Kings County. Detective Avila activated a probable cause I-card, then conducted a controlled call between the complainant and defendant. Detective Chiarantano, of the Brooklyn South Warrant Squad, testified she was assigned a probable cause to arrest I-card for the defendant, and that she spoke with Detective Davila who indicated the defendant is wanted for one of two incidents against the same complainant.
Given the testimony of the detective, the court finds that Detective Chiaratano had probable cause to arrest the defendant based on information provided by Detective Avila and the I-card.
C. Huntley
A statement by the defendant is admissible at trial only if the People establish the voluntariness of each statement beyond a reasonable doubt. (CPL §60.45[1]; People v. Witherspoon, 66 NY2d 973, 974 [1985]). A statement is deemed to be "involuntary" if it was coerced by the "used or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant's physical or mental condition to the extent of undermining his ability to make a choice whether or not to make a statement." (CPL §60.45[2][a]).
When there is a challenge to the voluntariness of a statement, the court must examine the totality of the circumstances under which the statement is made, including the characteristics of the accused and the circumstances under which the statement was made (see People v. Guilford, 21 NY3d 205, 208 [2013]).
A statement obtained by law enforcement may also be deemed involuntary if obtained by certain improper promises or statements of facts, or in violation of the State or Federal constitutions (CPL §60.45 [2] [b] [i], [ii]). One of those constitutional rights, the privilege against self-incrimination, is protected by the Miranda rule, which is triggered when a suspect is subject to a "custodial interrogation" (see People v. Berg, 92 NY2d 701, 704 [1991]).
"Under the Chapple-Bethea doctrine a suspect's course of interrogation is assessed using certain fairly objective criteria to characterize it either as unitary or composed of severable, separately Mirandizable segments." (People v. Guilford, 21 NY3d 205, 209 [2013]). However, that inquiry does not fully address the problem of actual coercion. The court must analyze whether the physical, cognitive, and emotional depletion of the interrogation subject renders the provision of Miranda warnings a mere formality. In addition, objective indicia of separation in episodes of interrogation may not be sufficient to "render plausible the characterization of a subsequent admission as voluntary beyond a reasonable doubt." (Id.).
In determining whether a subsequent statement made after Miranda warnings were given was part of a "single continuous chain of events," the court considers various factors including [*3]"whether the same police personnel were present and involved in eliciting each statement; whether there was a change in the location or nature of the interrogation; the circumstances surrounding the Miranda violation, such as the extent of the improper questioning; and whether, prior to the Miranda violation, defendant had indicated a willingness to speak to police" People v. Rodriguez, 132 AD3d 781, 783, (2015) (citing People v Paulman, 5 NY3d at 130-131).
i. Custodial Interrogation
For purposes of Miranda, a person is in custody if in that same situation, a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave (see People v. Harris, 48 NY2d 208, 215 [1979]); People v. Yukl, 25 NY2d 585, 589 [1969], cert. denied 400 US 851 [1970]). Moreover, "[t]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (People v. Ferro, 63 NY2d 316, 322 [1984], cert. denied 472 US 1007[1985], quoting Rhode Island v. Innis, 446 US 291, 301 [1980]).
In this case, its clear from the record, the defendant was never free to leave, and acted under the directive of the law enforcement from the time their interaction began.
The court finds that the defendant was subjected to a custodial interrogation for which he should have been provided Miranda warnings. Accordingly, the defendant's motion to suppress the noticed statements is granted.
D. Payton
In Payton v. New York, the Supreme Court invalidated the constitutionality of New York statutes that authorized police officers to enter private residences without a warrant to make a felony arrest. (Payton v. New York, 445 US 573 [1980]). In Payton, the police acted upon probable cause, but they did not have the consent of any occupant of the premises nor were there any exigent circumstances that would have otherwise justified their warrantless entry.
"Where a person with ostensible authority consents to police presence on the premises, either explicitly, or tacitly, the right to be secure against warrantless arrests in private premises as express in Payton v. New York (445 US 573 [1980]) is not violated" (People v. Russo, 243 AD2d 658, 659 [1997]; see People v. Read, 74 AD3d 1245, 1246 [2010]).
"Under article 1, § 12 of the New York Constitution and the Fourth Amendment of the United States Constitution searches and seizures inside a home without a warrant are presumptively unreasonable" (People v. Cuencas, 40 NY3d 480, 487 [2023]; People v. Knapp, 52 NY2d 689, 694 [1981]; Payton v. New York, 445 US 573, 590 [1980] [explaining that with respect to the home, the Fourth Amendment draws a "firm" line at the entrance to the house"]). Absent one of two narrow circumstances, exigent circumstances or voluntary consent, the police may not enter a private dwelling to arrest its occupant without an arrest warrant (People v. Levan, 62 NY2d 139, 144 [1984]; Payton, 445 US at 587-588).
i. Exigent Circumstances
In determining whether exigent circumstances exist the courts have applied several factors. These factors include:
"(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed and dangerous; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the [*4]entry" (United States v. Martinez-Gonzalez, 686 F2d 93, 100 [2d Cir 1982] [internal quotation marks and citations omitted]; see also United States v. Reed, 572 F2d 412, 424 [2d Cir 1978]; People v. Cloud, 168 AD2d 91, 92-94 [1st Dept 1991], affd 79 NY2d 786 [1991]).
The court agrees with the defendant's argument that from the record it's clear that exigency is completely inapplicable.
ii. Consent
When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it may show that permission to search was obtained from a third party who possessed common authority over the premises (United States v. Matlock, 415 US 164 [1974]). In the present case the issue is whether the People sustained their burden to establish that Ms. Scott provided consent to the responding officers to enter the premise in question, where they located the defendant.
Whether an individual voluntarily consented to a police search is a mixed question of law and fact (see People v. Valerio, 95 NY2d 924, 925 [2001]). Our state and federal constitutions require some communication or conduct by the person giving consent to support a claim of authority. (People v Cuencas, 40 NY3d 480, 490 [2023])
1. Third Party Consent
In Coolidge v New Hampshire, the Untied States outlined third-party consent as an exception to the warrant requirement (Coolidge v New Hampshire, 403 US 493 [1971]). Whenever the "prosecution seeks to justify a warrantless search by proof of voluntary consent," it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected" (United States v Matlock, 415 US 164, at 170-171, 94 SCt 988 [1974]).
If officers "rely in good faith on the apparent capability of an individual to concern to a search and the circumstances reasonably indicate that the individual does, in fact, have authority to concern, evidence obtained as a result of such a search should not be suppressed" (People v Adams, 53 NY2d 1, 9 [1981]). Whether an individual voluntarily consented to a police search generally presents a mixed question of law and facts (see People v Valerio, 95 NY2d 924 [2000]).
"[T]he apparent authority of a third party to consent to a search of a suspect's personal effects must rest upon the police officer's reasonably held factual interpretation of the circumstances; it cannot be based on a mistaken view of the law" (People v. Gonzalez, 88 NY2d 289, 295 [1996]). "[A] warrantless search will not be justified merely upon a bald assertion by the consenting party that they possess the requisite authority" (People v. Adams, 53 NY2d 1, 9-10 [1981]) Nor may the police proceed without making some inquiry into the actual state of authority when they are faced with a situation which would cause a reasonable person to question the consenting party's power or control over the premises or property to be inspected (Adams, 53 NY2d at 10).
There is conflicting testimony about who opened the door to the defendant's room. But it's clear that the officers met with Ms. Baker and she brought them to the defendant's room. The defendant stated the staff have access to the rooms, and that they entered with the police after he failed to answer the door. His recollection of events is more complete whereas the arresting officer's recollection lapses are crucial moments.
2. Fourth Amendment as applied to Shelters
Historically, fourth amendment jurisprudence has developed around stable private spaces such as the home, and the like, as well as within institutions like dormitories or workspaces. Homelessness turns this analysis upside down as "homes" become shelter beds, cots in congregate facilities, tents under highways, and belongings in a shopping cart. The court has wrestled with this issue, applying fourth amendment doctrine in a world where poor people's "houses, papers, and effects" are scattered across public and quasi-public spaces.
Under Article XVII, §1of the New York Constitution and the landmark case Callahan v Carey, New York City has a judicially enforced right to shelter for unhoused people. As a result, the state itself is running many of the places where people live.
In Prophete v Acebedo-Smith, the court acknowledged that a real question exist as to whether a long-term shelter resident has a reasonable expectation of privacy in a locked locker, and found genuine disputes of material facts as to whether the officer conducted an unreasonable search (Prophete v Acevedo-Smith, 743 F Supp 3d 440, 445 [EDNY 2024]).
Ultimately the court in Prophete granted the motion to dismiss on grounds that the defendant, a New York City Department of Homeless Services officer had qualified immunity against §1983 civil rights violation claims. However, in reaching that conclusion, it did provide helpful guidance for analyzing fourth amendment concerns at shelters. Regarding the plaintiff Prophete's expectation of privacy, the court stated "[he] did not lose all reasonable expectations of privacy simply because he resided at a shelter. And that "his choice was between the 'shelter and the streets,' so Samaritan Village was the 'most privacy place [he] could possibly have gone." (Prophete at 448, see Cmty for Creative Non-Violence v Unknown agents of the U.S. Marshals Serv., 791 F Supp 1, 6 (D.D.C. 1992); see United States v Voice, 622 F3d 870, 877-78 (8th Cir. 2010) [finding "troubling" government's implication that "a person has no Fourth Amendment" rights in a closed container left unattended near a bunk in homeless shelter, college dormitory, or military barracks."])
In People v Robinson, a second department case, the court found that the "shelter supervisor and guard, by virtue of their control over access to the shelter's rooms, and their maintenance of the sign-in blotter and metal detectors, were authorized by the shelter's inhabitants to consent to entry into the shelter and the rooms by anyone who had legitimate business there" (People v Robinson, 300 AD2d 511, 511 [2d Dept 2002]; see People v Nalbandian, 188 AD2d 328, 329 [1st Dept 1992]). In the almost quarter-century since that decision, the reality of homelessness has changed significantly, requiring a more robust analysis to safeguard the unprecedented number of people who require shelter.
Drawing on the few state and federal courts that have addressed this issue, and the need for guidance, the court finds the following factors relevant to address both the objective and subjective aspects of the reasonable expectation of privacy test: (1) whether the facility is state or privately run, (2) whether the facility has a stated or posted policy regarding searches, (3) the physical layout of the facility, (4) how the space or object in questions is used, (5) actions taken by the occupant to exhibit an actual expectation of privacy and (5) the policies and procedures used to screen individuals entering and leaving the facility.
These factors lean in favor of finding a reasonable expectation of privacy. In Robinson, there were no doors or locks preventing entry onto the rooms in which the shelter's inhabitants were assigned. Here, the setup explicitly included a locked room for whom the defendant was the only assigned occupant; and the record supports the conclusion that the assigned space had a [*5]door and a lock. The testimony regarding Ms. Baker, the alleged manager at the facility, makes clear that no inquiries were made regarding Ms. Baker's authority. None of the case law stands for the proposition that any person present at a location has blanket authority to permit a search of an occupant's constitutionally protected space. It's also abundantly clear that Ms. Baker and the defendant were in no way cohabitating.
The defendant testified that he heard two knocks at his door, then heard the doorknob jiggle before seeing the door open and the officers entering his room. He stated he was in bed, not fully clothed and was ordered to get dressed. There is some disagreement about whether the officers physically entered the room or stood at the threshold. It makes no difference for our analysis as the opening of the door is what disturbed the reasonable expectation of privacy; its irrelevant whether the officer stepped inside and then ordered the defendant to get dressed; or stood at the threshold after having the manager open the door and then ordered the defendant to get dressed and step out of the room.
The court finds that the police's actions violated the Payton rule prohibiting warrantless entry into a home to conduct an arrest. Any physical evidence seized as a result must be suppressed.
Accordingly, defendant's Dunaway, Huntley, Payton motion is denied in part and granted in part.
The foregoing constitutes the decision and order of the court.
Date: December 17, 2025
Hon. Edward H. King, J.S.C.